Filed 2/3/22  P. v. Ballard CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

DANIEL LANCE BALLARD, JR.,

     Defendant and Appellant.

E075606

(Super.Ct.No. RIF1704110)

OPINION

APPEAL from the Superior Court of Riverside County.  Charles W. Campbell, Jr., Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Daniel Lance Ballard brutally punched, kicked and choked Jane Doe, the victim, with whom he had been in an on-off relationship for years, causing a broken nose, dislocated jaw, a partially amputated ear, a large slash on her hand and bruising on her body. He was convicted by a jury of inflicting corporal injury resulting in a traumatic condition (Pen. Code[1], § 273.5, subd. (a)) and mayhem (§ 203), with a finding of great bodily injury (§ 12022.7 subd. (e)). True findings were also made on prior convictions and Three Strikes allegations, resulting in a prison sentence of 25 years to life plus 10 years. Defendant appealed.

On appeal, defendant argues (1) the evidence is insufficient to support the mayhem conviction; (2) the court erred in admitting evidence of prior acts of domestic violence pursuant to Evidence Code section 1109; (3) admission of evidence from an expert on domestic violence violated his due process rights; and (4) the cumulative effect of the errors requires reversal. We affirm.

## BACKGROUND

Jane Doe had known defendant since first grade and they had dated on and off for about five years. She loved him but knew he had a bad temper. In October 2016, defendant started being abusive towards Doe. At that time, defendant was angry about

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

something Doe said to a third person, so at approximately 6:00 p.m., he entered her house, snatched Doe off the bed, dragged her downstairs and bit her face twice, near her eye and cheekbone. He also threatened to kill Jane Doe and her daughter. Doe's daughter walked in the house, saw appellant holding Jane Doe down with his arm wrapped around her neck, and tried to call 911, but appellant broke the phone. The daughter got out of the house and called police, possibly from a friend's house. When the police responded, Doe denied that defendant assaulted her because she did not want to get him into trouble. Nevertheless, she wanted him to stay away from her because he started being abusive "every now and then," so she took photographs of her face a few days later in case something ever happened to her. The assault left her with a black eye and teeth marks on her face.

With the photographs, Doe obtained a temporary restraining order against appellant, but she did not return to court to get a permanent restraining order because defendant was using her car at the time and he promised to return the car if she would drop the restraining order. Doe broke up with defendant after this incident. However, Doe resumed her relationship with defendant because she loved him and believed in the relationship.

On the morning of September 9, 2017, appellant called Jane Doe and asked for a ride to the store. Doe was involved in a fundraising event for her daughter's cheer team, so she was unable to drive him right then, but in the late afternoon, Doe drove to

3

defendant's residence in Perris, expecting to take him on his errand and return to her home in about an hour or two.

But when Doe arrived at defendant's house, he was not in a rush to go to the grocery store; instead, he wanted to go to the Pechanga casino. On the way to the casino, they stopped to buy alcohol, and at some point during the drive, defendant told Doe that he had impregnated another woman. Doe was confused and hurt but not angry.

At the Pechanga casino, they walked around, side by side, and drank for a couple of hours. Then Doe drove them back to defendant's residence in Perris, stopping on the way to purchase chips at a gas station. Once they reached defendant's residence, they spent time talking in the kitchen, but then defendant pulled Jane Doe into the bathroom because he wanted to have sex, but Doe did not want to have sex. This angered defendant, who left the house and told Doe to follow.

Defendant drove Doe's car and directed her to sit in the passenger seat. She was afraid because she knew about defendant's temper. As they drove down the street, they argued about the other woman defendant had gotten pregnant, because defendant wanted Doe to take care of the other woman's baby, but Doe cussed him out. Defendant became enraged and hit Doe in the face multiple times with his fist as he drove. Defendant told Doe he would teach her a lesson before she lost consciousness.

When Doe regained consciousness, defendant had parked the car somewhere in Perris and was pulling her out of the car by her arm and hair. Doe fell to the ground, where defendant began strangling her, telling her he was going to kill her. At some point

4

while she was on the ground, defendant kicked her in the face and attempted to strangle her.

Defendant then pulled Doe onto the hood of the car where he continued beating her. He pulled off Doe's clothes and attempted to have sex with her, but was unsuccessful. At some point, Doe was back in the passenger seat where defendant demanded that she masturbate, but Doe lost consciousness again.

When Doe next awoke, the sun was coming up, and defendant took her back to his residence in Perris. Defendant told her that her face looked ugly and that her ear would not stop "leaking." Doe asked defendant to take her to the hospital, promising to tell medical staff that she got into a fight at a bar. Before agreeing to take her to the hospital, defendant wanted Doe clean herself and the car, because blood was splattered on the windows and the interior of the car. Then he gave her some of his own clothes to change into because hers were bloody and drove the car through a gas station car wash. Doe wanted to get away from defendant, but he was driving the car and had taken her phone.

Defendant drove Jane Doe to the hospital, but in the room with her, so Doe reported that she had been jumped by three girls at a night club the previous evening. The physician's assistant who examined Doe described her condition as "badly beaten up," and that she appeared somber and sad. His examination revealed Doe suffered a broken nose, a dislocated jaw, soft tissue swelling of the scalp and a partially amputated ear. Thirty percent of the ear had been sheered from the scalp but was reattached with sutures. A three centimeter cut on the back of her hand also required stitches. Although

no fracture was found on the jaw, Doe had only 20 percent range of motion and could not fully open her mouth. In addition, Doe had bruising, swelling to the frontal scalp, and the treating physician's assistant suspected she had suffered a concussion.

After leaving the hospital, defendant drove Jane Doe to the pharmacy and then took her home, but he kept her car, promising to return it by 6:00 a.m. in the morning so Doe could take her daughter to school. Jane Doe cleaned herself up and went to bed. Her daughter came in approximately one hour after Doe returned home and asked Doe what had happened, so Doe told her daughter she was in a car accident.

Doe stayed in bed most of the day and finally called the police early the next morning. Doe, who had not been able to call authorities previously because she could not get away from defendant, had received text messages indicating he was on his way over to her house, and she believed defendant would return and kill her. When officers came to take her statement, one of them noticed bruising on her neck suggestive of strangulation, so she was taken to another hospital for evaluation. At this hospital, Doe learned there were also injuries to two vertebrae and bruising on her neck from the strangling attempt. This visit also confirmed she had suffered a dislocated jaw and a concussion. There were bruises on her arms. Doe's injuries required her to adopt a liquid diet for two months. By the time of the second trial, Doe still had a visible scar behind her ear and on her hand, and she continued to experience hearing issues as a result of the beating.

Doe had difficulty recalling what happened[2], so she was interviewed again a few days later, when she provided additional information to law enforcement. With this information, investigators reviewed GPS evidence[3] and Doe's descriptions of where she had gone with defendant on the night of the incident lined up with the information from the GPS coordinates. An investigator also confirmed that appellant visited the car wash, spent time at the hospital and drove to the victim's home in the time frame given by Jane Doe.

Law enforcement also examined Doe's car and found dents and scratches on the outside, along with leaves and twigs on top of the trunk lid. Blood stains were found throughout the inside and outside of the car.

Defendant first went to trial on an amended information with kidnap for rape (§ 209, subd. (b)(1), count 1), forcible rape (§ 261, subd. (a)(2), count 2), corporal injury to an intimate partner (§ 273.5, subd. (a), count 3), and intentional violation of a protective order (§ 273.6, subd. (a), a misdemeanor, count 4). Counts 1-3 included allegations that defendant personally inflicted great bodily injury. The information was

[2] A forensic nurse who testified as an expert explained that when a person suffers a sudden traumatic event, the brain reacts with the "fight, flight or freeze" response, which affects memory formation.

[3] Defendant wore an ankle monitor at the time of the offense so his movements could be tracked. During in limine proceedings, defendant requested that evidence of his parole status be excluded pursuant to Evidence Code section 352, including evidence he wore an ankle monitor. The court ruled that GPS evidence of the locations he visited was admissible, but that the ankle monitor source of the information should not be mentioned, so the jury was not informed that it was derived from a monitoring device. However, during the defense case in chief, defendant elicited the fact that he had been fitted with an ankle monitor and that it tracked his movements on the night of the offense.

amended prior to trial to allege two prison priors (§ 667.5, subd. (b)), four serious felony convictions (nickel priors, § 667, subd. (a)), and five strike priors (§ 667, subds. (c) & (e)(2)(A)).

In 2019, after the first trial, a jury found appellant not guilty of kidnapping for rape (§ 209, subd. (b)(1)), rape by force (§ 261, subd. (a)(2)) and intentional violation of a court order (§ 273.6, subd. (a)). The jury was unable to reach a verdict on the infliction of a traumatic condition count (§ 273.5, subd. (a)). A mistrial was declared as to count 3.

Prior to commencement of retrial, the People filed a third amended information, realleging the domestic violence charge (§ 273.5, subd. (a), count 3), and adding count 5, mayhem (§ 203). The third amended information omitted the prison prior allegations[4] and reduced the number of prior strikes to four. Following the trial by jury, in which the counts were renumbered one and two, defendant was convicted of both counts. After requesting that the court exercise its discretion to strike or vacate his strike allegations pursuant to section 1385 (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497), defendant admitted three prior serious felony convictions. The court struck one strike allegation, denied probation, and sentenced defendant to 25 years to life on count five, and stayed a sentence of 25 years to life for count three. On the People's motion, the great bodily injury enhancement was stricken. The court added two five-year terms for

---

[4] The Legislature enacted Senate Bill No. 136 (Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020), which eliminated punishment for prior prison terms except for prison terms served for sexually violent offenses.

two of the nickel priors, imposing a concurrent term for one of the section 667, subdivision (a) enhancements.

Defendant timely appealed.

## DISCUSSION

1.      *There is Substantial Evidence to Support the Mayhem Conviction.*

Defendant argues there is insufficient evidence to support the conviction for the crime of mayhem.  Specifically, he argues her injuries did not result in the type of grave, permanent disfigurement or permanent disability required under the mayhem statute.  We disagree.

a.      *Standard of Review*

When reviewing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review.  Under this standard, we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

In performing this task, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.)  "Resolution of conflicts and

inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

      b.    *Analysis*

For the crime of mayhem, pursuant to section 203, the jury must find beyond a reasonable doubt that the elements of the crime were proven. Section 203 provides, "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Section 203 "'protects the integrity of the victim's person'" (*People v. Santana* (2013) 56 Cal.4th 999, 1004, quoting *People v. Page* (1980) 104 Cal.App.3d 569, 578; see also *People v. Green* (1976) 59 Cal.App.3d 1, 3), although "'not every visible scarring wound'" [citation] may establish mayhem under section 203. (*People v. Santana, supra*, 56 Cal.4th at p. 1004, and cases cited.)

"A 'member of the body' is a general term describing any integral part or vital organ of the body." (*People v. Romero* (2019) 44 Cal.App.5th 381, 386, citing *People v. Robinson* (2014) 232 Cal.App.4th 69, 76.) With respect to the element of a disabling injury, the victim's disability must be more than "slight and temporary." (*People v. Turner* (2019) 37 Cal.App.5th 882, 889.) "Disfigurement of the body "'impairs or injures the beauty, symmetry or appearance of a person or thing . . . [or] renders unsightly, misshapen or imperfect or deforms in some manner.'"" (*Romero, supra,* at p. 387, quoting *People v. Page* (1980) 104 Cal.App.3d 569, 577.) To prove mayhem based

10

on a disfiguring injury, the injury must be permanent. (*Santana, supra*, 56 Cal.4th at p. 1007; see also People v. *Newble* (1981) 120 Cal.App.3d 444, 447 [if an injury is likely to leave a permanent scar, it constitutes disfigurement].)

Permanent scarring constitutes a disfiguring injury. (*People v. Page, supra*, 104 Cal App.3d at p. 578.) An injury within the meaning of mayhem is still considered permanent if modern technology effectively repairs the injury. (*People v. Hill* (1994) 23 Cal.App.4th 1566, 1574.) Accordingly, "the possibility of medical alleviation [does] not . . . diminish one's culpability for infliction of an injury that would otherwise constitute mayhem." (*Id.,* at p. 1572.)

Defendant argues the medical evidence failed to support the victim's claims about the severity of those injuries, where the physician's assistant who treated the injuries estimated the cut to the ear was three or four centimeters in length and the laceration to the back of her hand was also three centimeters. Yet the nature of the injury to the victim's ear is one of the particular injuries specified in section 203 as mayhem: a slit ear, which was 30 percent detached from her head. Defendant confuses size of the cut with permanent disfigurement and has overlooked that the same medical witness described the ear injury as an avulsion, or an injury in which part of the ear was amputated or detached.

Defendant also omits to mention that the victim continues to suffer from hearing issues resulting from the 30 percent partial ear avulsion, or amputation, committed by

11

defendant. Even without the evidence of the scarring injury to the victim's hand, the ear injury was permanently disfiguring, although made less so by medical intervention.

There is substantial evidence to support count 5, the mayhem conviction.

2.      *There Was No Abuse of Discretion in Admitting the Prior Acts of Domestic Violence.*

Defendant argues the trial court erred in admitting evidence of a prior incident of domestic violence involving the victim. During in limine motions, the court authorized admission of two incidents, which defendant opposed on the ground Doe had given different accounts of the October 2016 incident. During her testimony, Doe did not refer to the second incident, occurring in April or May 2017, so his challenge is directed at the admission of the October 2016 incident. Defendant argues the court abused its discretion in admitting Doe's "uncorroborated testimony" about the October 2016 incident because it was unduly prejudicial to his case. We disagree.

Although character or propensity evidence, including evidence of a person's prior conduct, is generally inadmissible to prove the person's conduct on a specific occasion (Evid. Code, § 1101, subd. (a)), the Legislature has created a specific exception to the rule where a defendant is charged with an offense involving domestic violence. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) Pursuant to Evidence Code section 1109, evidence that the defendant committed other uncharged acts of domestic violence is admissible to show the defendant has a propensity to commit such acts, unless the

12

evidence is precluded under Evidence Code section 352. (Evid. Code, § 1109, subd. (a)(1); *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.)

Evidence Code section 1109 is generally subject to the limitation by which such evidence is subject to exclusion where admission of the evidence would be more prejudicial than probative within the meaning of Evidence Code section 352. (Evid. Code, § 1109, subds. (a)(1), (e).) If the prior incident occurred more than 10 years ago, it is also subject to exclusion unless the court finds the interests of justice would be served thereby. (Evid. Code, § 1109, subd. (e).)

The rationale underlying enactment of Evidence Code section 1109 is that by admitting evidence of a defendant's other acts of domestic violence to show a disposition to commit acts of domestic violence, the statute eliminates any presumption that "'the charged offense was an isolated incident, an accident, or a mere fabrication.'" (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1075 quoting Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, p. 3; see *People v. Falsetta* (1999) 21 Cal.4th 903, 916–917 ["[b]y reason of [Evid. Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se"]; *People v. Johnson* (2010) 185 Cal.App.4th 520, 532.)

Under Evidence Code section 352, trial courts have "discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Mendoza* (2007) 42 Cal.4th 686, 699; *People v. Carter* (2005) 36 Cal.4th 1114, 1168.) "'''The

13

'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"" (*People v. Williams* (2013) 58 Cal.4th 197, 270 quoting *People v. Bolin* (1998) 18 Cal.4th 297, 320.)

"Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.)  "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.'

"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638, quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377; see also *People v. Wang*, supra,  46 Cal.App.5th at pp. 1075-1076.)

""[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly

prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'"'" (*People v. Megown* (2018) 28 Cal.App.5th 157, 164, quoting *People v. Doolin* (2009) 45 Cal.4th 390, 439.)

"We review the trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Disa* (2016) 1 Cal.App.5th 654, 672.) We "will not disturb the court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Megown, supra,* 28 Cal.App.5th at p. 164.)

Here, while there were two proffered incidents, the victim was only examined on one incident. There was nothing extraordinarily violent about that incident, at least, the scope of the prior assault and extent of the injuries was much less severe in that incident. As for the victim's inconsistent versions of the prior incident, defendant had ample opportunity to, and did, conduct, extensive cross-examination. The jury was instructed it could disregard the incident, so there was nothing unduly prejudicial about the prior incident.

There was no abuse of discretion in admitting testimony about the October 2016 prior incident of domestic violence.

3. *There Was No Due Process Violation in Admitting the Testimony of a Domestic Violence Expert.*

Defendant argues his due process right to a fair trial was violated when the trial court permitted the People to call an expert witness to testify about intimate partner

15

violence to explain the "three-phase cycle" of domestic violence and to explain certain counter-intuitive behaviors of women subject to such abuse from their intimate partners. Defendant argues the evidence was irrelevant to the facts of this case insofar as the victim did not fit the profile of a battered woman, she described only one prior act of violence which was uncorroborated, she was not a "recanting witness", and she ended the relationship with defendant. We disagree.

Evidence Code section 1107, subdivision (a), enacted after the Court of Appeal decision in *People v Aris* (1989) 215 Cal.App.3d 1178 (see Stats. 1991, ch. 812, § 1, pp. 3612-3613), provides: "'In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.'" (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1400.)

Defendant asserts the central issues of the case were the identity of the perpetrator and the severity of the issues inflicted. He observes that defendant's opposition to the expert testimony was grounded on the position that Doe did not fit the "profile" of a battered woman, rendering the expert testimony on the "cycle of violence" irrelevant.

In *People v. Brown* (2004) 33 Cal.4th 892 (*Brown*), the reviewing court considered the "conundrum" presented by the question of the admissibility of expert testimony on domestic violence where the victim has not been subjected to an extended

16

period of abuse. The court, however, in analyzing Evidence Code section 1107, concluded that the statute authorizes the expert to testify regarding "'the nature and effect of physical, emotional, and mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence.' Persons who have only been assaulted once are still 'victims of domestic violence.'" (*Brown, supra*, at pp. 904-905.) The court went on to state that the admission of expert testimony does not depend on fitting it under Evidence Code section 1107. (*Brown*, *supra*, at p. 905.)

Defendant acknowledges that the admission of such evidence, as conceded by defendant, is subject to review for an abuse of discretion. On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 444–445; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171.) This standard applies equally to a decision of a trial court to admit expert testimony, which "'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.]" (*People v. McAlpin* (1991)53 Cal.3d 1289, 1299.)

"When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness." (*Brown, supra,* 33 Cal.4th at p. 906, and authorities there cited.) Qualified expert testimony is admissible when that testimony may "assist the trier of fact." (Evid. Code, § 801, subd. (a).) Expert testimony in intimate partner battering, "including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence," is

admissible in a criminal action "except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).) Testimony that an abuser often "uses psychological, emotional, or verbal abuse to control the victim" is admissible in this context to assist the jury in assessing the victim's credibility. (*Brown, supra,* 33 Cal.4th at pp. 906-907; *People v. Gadlin* (2000) 78 Cal.App.4th 587, 595.) To establish that an abuser has used such methods of control over a victim, it is not necessary that the defendant has been a chronic abuser or that the victim be pathologically dependent on the abuser. It is entirely possible for a relationship dynamic to manifest over a short period of time involving few incidents of violence.

Here, the evidence showed the victim knew the defendant since childhood, was well familiar with his "temper", that he threatened to kill her or harm her daughter on at least two occasions, and despite these facts, Doe engaged in an on-and-off relationship with defendant of several years' duration. She had recounted that as of October 2016 he started being abusive "every now and then." In other words, while defendant's prior abuse may not have risen to the level of violence he exhibited in the incident that led to the charges of which he was convicted, there was a pattern of violence of an escalating nature, an on again-off again relationship, and her desire to avoid getting him into trouble, that the average juror might not be able to comprehend without the assistance of an expert's testimony.

18

The testimony of an expert on the reasons that a victim of abuse by an intimate partner might recant, or give inconsistent reports of an incident to explain injuries sustained at the hands of the intimate partner was a subject beyond the understanding of the average juror so the admission of the evidence would assist the trier of fact. The jury was entitled to understand that Doe's denials of abuse, which form the basis for defendant's challenges to the reliability of his convictions, might well have been evidence of a cycle of abuse.

To the extent defendant on appeal raises a federal constitutional claim distinct from his claim that the trial court abused its discretion under Evidence Code section 352, he forfeited this claim by failing to identify that ground in his objections to the trial court. (*People v. Partida* (2005) 37 Cal.4th 428, 437–438.) "To the extent any constitutional claim is merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion in admitting the evidence." (*People v. Riggs* (2008) 44 Cal.4th 248, 292; *People v. Prince* (2007) 40 Cal.4th 1179, 1229.) In any event, having failed to establish error, there could be no violation of defendant's right to due process.

We find no abuse of discretion in the present case.

4.      *The Cumulative Effect of No Errors.*

A claim of cumulative error is a due process claim based on the cumulative impact of multiple individual but harmless errors. (See, e.g., *People v. Rogers* (2006) 39 Cal.4th

826, 911.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'  [Citation.]"  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Here, defendant received due process and we have found no errors.  There is therefore no cumulative error.  The zero effect of errors, even if multiplied, remains zero.  (See *People v. Loewen* (1983) 35 Cal.3d 117, 129, citing *People v. Gale* (1973) 9 Cal.3d 788, 806, [dis. opn. Mosk, J., "Six times zero, in my arithmetic, still equals zero."].)

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.

20